UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TIMOTHY GREENLEE, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:23CV788-PPS/JEM |
| CHRISTINA REAGLE, et al., | |
| Defendants. | |

OPINION AND ORDER

Timothy Greenlee, a prisoner proceeding without a lawyer, seeks preliminary injunctive relief in this case.[1] (ECF 13, 20.) He is proceeding on the following claims: (1) a claim for damages against two prison employees for failing to protect him from being attacked by other inmates; (2) a claim against the Warden of Miami Correctional Facility ("MCF") for injunctive relief related his ongoing need for protection from other inmates; and (3) a claim against the Indiana Department of Correction Commissioner for injunctive relief related to his ongoing need for a transfer to another facility for security reasons. (ECF 12.) He claims he is in danger at MCF and is being targeted by gang members because he has on several occasions found drugs in the prison, which he gave to guards, who in turn told other inmates about his actions in an attempt to label him a snitch. He claims one inmate retaliated against him by "putting PCP in his food," and another threw urine on him in the shower. In a recent filing, he claims the threats

---

[1] I inferred a request for a preliminary injunction in his complaint. He has since filed a separate motion requesting a preliminary injunction.

have continued since the case was filed and that in an incident occurring in late October 2023, an inmate tried to throw urine on him in the shower. (ECF 20.) He asks to be moved to protective custody and to be transferred to another facility for his safety. I ordered a response from the Warden, which has now been filed. (ECF 23.)

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, I do not simply "accept [the plaintiff's] allegations as true, nor do [I] give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, I must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "Mandatory preliminary injunctions" requiring the defendant to take affirmative acts, like the one Mr. Greenlee seeks, are viewed with particular caution and are "sparingly issued[.]" *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotation marks omitted). Additionally, in the prison context, my ability to grant injunctive relief is significantly limited. Any remedial injunctive relief "must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citations and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining the strict limitations on granting injunctive relief in the prison setting).

To prevail in this lawsuit, Mr. Greenlee must show that his Eighth Amendment right to protection from other inmates has been violated. The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates" and to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). However, "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005).

"[T]he fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010). This is a high standard. The plaintiff must show the defendant "acted with the equivalent of criminal recklessness, in this context meaning they were actually aware of a substantial harm to [plaintiff's] health or safety, yet failed to take appropriate steps to protect him from the specific danger." *Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008). "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Nor does making a "mistake" or exercising "poor judgment" satisfy the deliberate indifference standard. *Giles v. Tobeck*, 895 F.3d 510, 514 (7th Cir. 2018).

I must also consider the Supreme Court's admonition that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Prisoners do not have a constitutional right to the housing assignment of their choice, and where best to house a prisoner is ordinarily a matter

4

firmly committed to the discretion of prison officials. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996).

The Warden's response and supporting documentation reflect that Mr. Greenlee arrived at MCF in March 2023. (ECF 7-1 ¶ 4.) Shortly after his arrival, he asked his Unit Team Manager to be moved to protective custody, claiming that gang members were threatening him and extorting his family members. His request was forwarded to the protective custody ("PC") committee, which met with Mr. Greenlee and conducted an investigation. (ECF 23-5 at 1.) Mr. Greenlee provided the name of a family member who was allegedly being extorted, but upon contacting him the PC committee learned this person was Mr. Greenlee's pen pal, not a family member. (*Id.*) This individual claimed to have paid money to other inmates for Mr. Greenlee's protection, but would not provide any other details. (*Id.*) The committee was unable to verify his allegations and denied his request. (*Id.*)

In April 2023, Mr. Greenlee was observed in his cell kicking the door with a knife in his hand. (ECF 23-3 at 3-6.) He was charged with a conduct violation and moved to restrictive housing. (*Id.*) In late May 2023, he was discovered in his cell hanging by his neck from a bedsheet. (*Id.* at 7.) He was revived by a correctional officer and received care from medical staff; this included an administration of Narcan for an apparent overdose. (*Id.*) He was then placed on suicide watch. (*Id.*) Later that night, he was found with his underwear tied around his neck and was sprayed with chemical spray after he refused to remove them. (*Id.* at 9.) He remained in restrictive housing during June and

5

July. During this period, he filed more requests for protective custody,[2] but because he was already being separated from other inmates no additional measures were taken. (ECF 23-7 at 1-2.)

In August 2023, he was moved from restrictive housing to Alpha Housing Unit ("AHU"), another isolation dormitory that houses inmates who have expressed concerns about their safety but have not been formally granted protective custody. (ECF 23-5 at 1-2; ECF 23-8 at 2.) In September 2023, the PC committee met with Mr. Greenlee again to consider another request for placement in protective custody. This time he stated that he was being targeted because "he turned in information regarding staff involved in a sexual relationship" with various inmates. (ECF 23-5 at 2.) His allegations could not be substantiated, but the committee noted that he had incurred a conduct violation for possessing a controlled substance. (*Id.*)

The PC committee recommended that he be transferred to another facility to participate in a substance abuse program, and that he remain in AHU until his transfer could be effectuated. (*Id.* at 1-2; ECF 23-7 at 1.) Inmates in AHU are "isolated from all other inmates 24 hours a day." (ECF 23-9 ¶ 5.) They are in their cells 23 hours a day with one hour of recreation, and the recreation area is divided into individual sections by fencing. (ECF 23-9 ¶ 5; ECF 23-10 ¶ 15.) They are also escorted to and from the showers by correctional staff. (ECF 23-10 ¶ 5.)

---

[2] He included some seemingly outlandish claims about receiving a "fake" letter from someone pretending to be his attorney, his peanut butter sandwiches being poisoned, and officers shocking him with "an unauthorized device they attached to the cell door." (ECF 23-4 at 10-13.)

The Warden disputes many aspects of Mr. Greenlee's account of the incidents giving rise to his concerns about his safety. For instance, Mr. Greenlee claims that the primary reason inmates view him as a snitch is because he found illegal drugs stashed around the prison and turned them into prison guards. There is no record of Mr. Greenlee having given any drugs to correctional staff, although on one occasion he handed something to Lieutenant John Heater, stating that it was "methamphetamine." (ECF 23-10 ¶ 10.) The lieutenant attests that the object was simply a piece of trash that he threw away. (*Id.*) Mr. Greenlee also claims that this lieutenant told other inmates about him finding their drug stash and yelled that they should "kill this motherfucker." The lieutenant disputes that he ever made such a statement or told other inmates that Mr. Greenlee found their drug stash, because no drug stash was actually found. (*Id.* ¶ 11.) The Warden also disputes that another inmate could have put PCP in Mr. Greenlee's food, providing evidence that meals for inmates are prepared in a separate building, sealed, and handed directly to them by correctional staff. (*Id.* ¶ 6.) The Warden does not expressly dispute the shower incident, but it can be discerned from the evidence he submits that Mr. Greenlee would not have encountered other inmates in the shower area while he was housed in restrictive housing or AHU.

This evidence undercuts the validity of Mr. Greenlee's claims about the danger posed to him at MCF. But even assuming he is or was in danger, the record reflects that adequate steps are being taken to protect him from harm. He is in a restricted housing unit where he is isolated from other inmates 24 hours a day, including during recreation and in the shower. The process is underway for him to be transferred to another facility,

7

and prison officials intend to keep him in AHU until the transfer occurs. He has not demonstrated a likelihood of success on his claim that his Eighth Amendment rights are being violated, and instead the record reflects that his requests for protection have been investigated and taken seriously. Nor has he demonstrated that he will suffer irreparable injury if I do not grant him immediate injunctive relief while this case is pending.

ACCORDINGLY:

The plaintiff's motions for preliminary injunctive relief (ECF 13, 20) are DENIED.

SO ORDERED on November 27, 2023.

    /s/ Philip P. Simon    .
JUDGE
UNITED STATES DISTRICT COURT